142 N.J. Super. 438 (1976)
361 A.2d 621
BERGEN COUNTY SEWER AUTHORITY, PLAINTIFF,
v.
BOROUGH OF BERGENFIELD, ET AL. DEFENDANTS.
Superior Court of New Jersey, Law Division.
Decided May 17, 1976.
*441 Mr. Stephen J. Moses for plaintiff.
Mr. Morton R. Covitz for defendant Borough of Bergenfield (Messrs Greenberg & Covitz, attorneys).
Mr. Frederick L. Bernstein for defendant Borough of Hillsdale (Messrs. Wittman, Anzalone, Bernstein & Dunn, attorneys).
Mr. Jacob Schneider for defendants Township of Teaneck, Boroughs of Cresskill and Westwood (Messrs. Schneider, Schneider & Behr, attorneys).
Mr. Martin T. Durkin for defendants Borough of Ridgefield Park and Township of South Hackensack (Messrs. Durkin & Foerst, attorneys).
Mr. Dennis J. Oury for defendant Borough of Ridgefield (Mr. Joseph R. Mariniello, attorney).
Mr. Robert H. Lichtenstein for defendant Borough of River Vale (Messrs. Gladstone, Hart, Mandis, Rathe & Shedd, attorneys).
Mr. Armand Pohan for defendant Borough of Fort Lee (McCarter & English, attorneys).
Mr. Francis J. De Vito for defendants Borough of Norwood and Northern Valley Communities.
Mr. Donald W. De Cordova for defendant Borough of Tenafly (Messrs. Morrison & Griggs, attorneys).
*442 Mr. Melvin R. Solomon for defendant Borough of River Edge (Mr. Ned J. Parsekian, attorney).
Mr. Ralph W. Chandless for defendant Borough of Hasbrouck Heights (Messrs. Chandless, Weller & Kramer, attorney).
Mr. Jerrold R. McDowell for defendant Borough of Harrington Park (Messrs. Winne & Banta, attorneys).
Mr. Thomas J. Viggiano for defendant Borough of Dumont (Messrs. Michael J. Breslin, Jr., attorney).
Mr. Arthur J. Lesemann for defendants City of Englewood, Borough of Maywood, Borough of Paramus and Borough of Leonia (Messrs. Mazer & Lesemann, attorneys).
TRAUTWEIN, A.J.S.C.
This proceeding is the final phase of a long and oftentimes bitterly contested controversy between the Bergen County Sewer Authority (Authority) and its constituent municipal corporations. The court has before it today eight separate applications for the allowance of counsel fees brought on behalf of individual attorneys and on behalf of various municipalities. The underlying rationale for these applications is that the various applicants contributed to bringing 2 1/2 years of litigation to a favorable settlement for all parties. In order to intelligently decide the issues presented by these applications reference must be made to prior litigation between many of the parties and to the main case which has generated the instant applications.
The genesis of the instant action may be traced to the case of Ceva v. River Vale Tp., 119 N.J. Super. 593 (App. Div. 1972), aff'd 62 N.J. 245 (1973). Ceva was an action by four taxpayers of the Township of River Vale which challenged the legality of cost-of-construction and service-to-the-municipality base charge imposed by the Bergen *443 County Sewer Authority upon municipalities entering and participating in the sewerage system. The Appellate Division held  and was affirmed by the Supreme Court  that the only kind of general charge for service to a municipality by the Authority expressly provided by statute is calculated on the basis of "rate times flow", i.e., the gross gallonage of sewerage placed into the system by the municipality multiplied by a uniform system-wide rate per gallonage unit (generally per million gallons). 119 N.J. Super. at 599.
Although sharply opposed and still debated today, the per curiam decision of the Supreme Court, decided on February 7, 1973, required the Authority to abandon its attempt to impose the base charge upon the so-called Northern Valley towns (River Vale, Norwood, Northvale, Haworth, Harrington Park, Demarest and Closter). This decision precipitated the present action. The instant suit was instituted by the Authority against the various municipalities constituting membership in the Authority. The complaint sought a declaratory judgment (1) approving the Authority's 1973 rate schedule, (2) determining the liability, if any, of the Authority to certain of its members for payments of now-illegal base charges made in prior years, and (3) reformation of a service agreement between the Authority and several member municipalities known as the Northern Valley agreement.
After the action was commenced numerous defendant-municipalities filed answers, cross-claims, counterclaims and separate defenses. The case mushroomed into what appeared to be an unmanageable and ultra-complex piece of litigation. In response to the approaching chaos, this court conducted a special pretrial conference on January 29, 1974. At the conference the court personally observed over 40 attorneys attempting to sort out the issues in the case and attempting to present arguments on behalf of their clients. The court felt that it was unprofessional, inappropriate and uneconomical to conduct this case in such a circus-like atmosphere. *444 Therefore, the court ordered that the number of briefs and attorneys be limited to five. This number was logically sound because it contemplated that a single attorney would represent the Authority, the Northern Valley towns, the Southern towns, the Pascack Valley towns, and the Miscellaneous towns. The constituency of these various classes is the following:

*445
 NORTHERN VALLEY PASCACK VALLEY SOUTHERN MISCELLANEOUS
 Closter Hillsdale Bergenfield Teaneck
 Norwood Montvale Bogota Westwood
 Demarest Park Ridge Carlstadt Cresskill
 River Vale Washington Township Cliffside Park
 Haworth Woodcliff Lake Cresskill
 Harrington Park River Vale Demarest
 Northvale Dumont
 East Rutherford
 Englewood
 Englewood Cliffs
 Fairview
 Fort Lee
 Hackensack
 Hasbrouck Heights
 Leonia
 Little Ferry
 Maywood
 Moonachie
 New Milford
 Oradell
 Palisades Park
 Paramus
 Ridgefield
 Ridgefield Park
 River Edge
 Rochelle Park
 South Hackensack
 Teaneck
 Tenafly
 Teterboro
 Westwood

*446 Also decided at the pretrial conference was a procedure for the disposition of various aspects of the case. The court amended the first and second counts of the complaint to permit a review of the Authority's 1974 (rather than 1973) rate schedule. The court condensed and redesignated the third count of the complaint to reflect a prayer that the Authority sought to reform existing contracts between itself and its members which contained any charges other than "rate times flow." The court further decided to stay all discovery and severed all claims unrelated to the Ceva decision. It ordered that various motions  all basically addressed to the sufficiency of the complaint and to the propriety of a summary judgment on the question whether refunds were due any municipalities as a result of Ceva  would be expeditiously briefed and argued.
The case was assigned to Judge O'Brien  then sitting in Bergen County  and he controlled the procedure of the case until the Summer of 1975.
It is clear from a letter sent to all attorneys by Judge O'Brien on June 6, 1974 that as early as April 19, 1974, he had recognized the following spokesmen-attorneys for the various classes of communities:
(1) Francis De Vito, Esq., representing the Northern Valley Towns.
(2) Frederick Bernstein, Esq., representing the Pasack Valley Towns.
(3) Martin Durkin, Esq., representing the Southern Towns.
(4) Jacob Schneider, Esq., representing Teaneck, Westwood and Cresskill.
At some point in time Martin Durkin made arrangements with Morton Covitz, Esq., to assist him in presenting the position of the Southern towns. Covitz' representation apparently met no resistance and it became accepted as a matter of course by the court and by his client-municipalities.
Throughout the latter half of 1974 the spokesmen-attorneys endeavored to present and to argue the Ceva-related *447 issues before Judge O'Brien. On or about January 24, 1975 Judge O'Brien ruled on these issues. He upheld the validity of all existing contracts between the Authority and its members; he held that the base charge provisions in the contracts were void; he denied the claim of unjust enrichment presented by the Southern towns, and he allowed the Pascack Valley towns to recover refunds for payments made in excess of the "rate times flow" formula. Furthermore, Judge O'Brien ruled that Ceva applied with equal force to Hasbrouck Heights. He expressly stated that Hasbrouck Heights' contract was essentially no different from any other contract of any other member and that Hasbrouck Heights would be bound in the same way as all the Southern towns.
As a result of this decision it became necessary to decide the following issues: (1) the amount of the refund to which the Pascack Valley towns were entitled; (2) the method of payment of the refunds; (3) whether the Northern Valley towns  which were not members of the Authority at the time the Pascack Valley towns paid the base charge under a mistake of law  should be obligated to participate in the restitution.
Discovery was conducted in order to sharpen these issues. On or about June 2, 1975 a hearing was conducted by Judge O'Brien at which time the Pascack Valley towns offered proof of their right to a refund. As part of this proof a letter to the Authority written by Hillsdale Mayor Gilbert Busch on January 3, 1967 was introduced which alleged that the base charge was illegal and which protested the payment by Hillsdale to the Authority. Apparently this letter had been circulated throughout the Pascack Valley communities. Based upon this evidence it was argued that the Pascack Valley towns were barred from restitution on the basis of the equitable defense of laches. On or about July 8, 1975 Judge O'Brien determined that laches was a viable defense and concluded that the issue raised questions *448 of fact which would require further lengthy proceedings at great cost to the public.
In response to this development Judge O'Brien initiated settlement discussions among the spokesmen-attorneys. A settlement was drafted and an order to show cause why a proposed settlement should not be approved was signed on July 10, 1975. On the return date of July 30, 1975 only Hasbrouck Heights objected to the terms of the settlement. The matter was adjourned one day in order to reassess Hasbrouck Heights' objections. On July 31, 1975 Hasbrouck Heights reaffirmed its opposition and the matter appeared to be stalemated.
In the early Autumn of 1975 the spokesmen-attorneys renewed their efforts to settle the case. Application was made to this court to seek its guidance in settling the matter. A hearing was held on October 14, 1975 at which time Hasbrouck Heights, through its attorney, again expressed its opposition to the settlement. Further, certain citizen-intervenors, represented by Ralph Chandless, Sr., Esq., sought to express their opposition to the settlement. This court entertained oral argument and continued to try to settle the case. Finally, on October 30, 1975 the court signed a consent order which removed intervenors' and Hasbrouck Heights' objections to the proposed settlement. On November 5, 1975 this court signed an order finalizing the settlement. The final judgment provided in pertinent part that:
(1) The Authority is entitled to a declaratory judgment as rendered by Judge O'Brien;
(2) Rebates are due the Pascack Valley towns in the total amount of $250,000 less approximately $40,000 previously withheld by Park Ridge and River Vale;
(3) All claims, contentions, and counterclaims not previously adjudicated are dismissed without prejudice;
(4) The Sewer Authority shall apply investment income to reduce rates within the limits prescribed by law.

CLAIMANTS AND BASIS OF CLAIM
There are presently pending eight applications for counsel fees. The amounts indicated are gross amounts and do not *449 reflect scrutiny by the court as to the merits of the claims. Five of the pending claims are presented by the so-called spokesmen-attorneys. The remaining three claims are made by municipalities seeking repayment for fees paid their individual counsel in this case:

 TOTAL
CLAIMANT CLASS (including disbursements)
De Vito Northern Valley Towns $20,089.85
Schneider Miscellaneous towns 12,350.85
Covitz Southern towns 15,732.40
Durkin Southern towns 17,417.99
Bernstein Pascack Valley towns no affidavit submitted
Boro of Hillsdale 35,517.20
 Mr. Walter Wittman,
 borough attorney
Township of River Vale 9,604.91
 Messrs. Gladstone, Hart, Mandis, Rathe
 and Shedd, borough attorneys
Borough of Harrington Park 11,700.00
 Messrs. Winne & Banta, borough attorneys
 ___________
 Total $122,413.20
 ___________

Other parties, notably Northvale and Englewood, have indicated that while at the present time they have no claim, if the court makes an award here, they will then seek to be reimbursed for their counsel fees. In opposition to the award of counsel fees are the Authority and Hasbrouck Heights.
The court, of course, is aware that the resolution of this issue is not an easy task. The Ceva order of May 29, 1973 granting Richard Kurland, Esq. a counsel fee in the amount of $50,000 presents to the court a seductive solution to the problem. Having read the extensive briefs submitted on behalf of Richard Kurland, the Court is nearly persuaded that the grant by the Supreme Court of the fees was based entirely on the cogent arguments presented on behalf of Kurland. However, the issue before the court is one of acute sensitivity and public importance and deserves a full and clear explanation of the applicable law.
*450 R. 4:42-9 governs the allowance of counsel fees generally. It was specifically adopted in response to abuses which were well known and need not be recounted here. See Sunset Beach Amusement Corp. v. Belk, 33 N.J. 162, 167 (1960). Although apparent exceptions to the letter of the rule have been made by our Supreme Court, e.g., Red Devil Tools v. Tip Top Brush Co., Inc., 50 N.J. 563 (1967), it is well settled that the rule is to be scrupulously applied and is limited to awarding counsel fees in the few specified situations. Sunset Beach Amusement Corp. v. Belk, supra at 167; Sarner v. Sarner, 38 N.J. 463 (1962); Gerhardt v. Continental Ins. Cos., 48 N.J. 291, 301 (1966). Virtually all counsel are aware of this general rule, and the briefs submitted on behalf of the applicants reflect their groping to fit the instant situation into one of R. 4:42-9's niches. The proposed arguments fall into two basic groups: (1) there is a fund in court, and (2) the award of counsel fees to attorneys participating in "public litigation" is an exception to R. 4:42-9. A third theory which the court itself has suggested is that the circumstances of the instant representations generated contracts implied in law, so called quasi-contracts which are outside the scope of R. 4:42-9. The court remains cognizant of the strict limitations of R. 4:42-9, yet it believes that the rule should be administered with a proper measure of equitable flexibility and with full recognition that the ends of justice must be scrupulously observed. To that end I make the following conclusions of law:

FUND(S) IN COURT

The principle of a fund in court contemplates that when a litigant creates a fund which will benefit others, it is against that fund that counsel fees are charged. Sunset Beach Amusement Corp. v. Belk, supra, 33 N.J. at 169. A fund ordinarily is tangible property which is brought within the physical control of the court by the efforts of counsel. The usual case involving a fund in court is one where the parties *451 seek to create or preserve a fund for the benefit of a class of which the parties are representatives. Driscoll v. Burlington-Bristol Bridge Co., 8 N.J. 433, 494, 495 (1952). In the instant case, it is contended that there are multiple funds in court. These funds may be described as the following:
(1) $210,000 representing refunds to the Pascack Valley Towns;
(2) Future savings to members of the Authority by the Authority's employment of investment income to offset and reduce operating expenses;
(3) The entire budget of the Authority inasmuch as the Authority purportedly submitted the same to the jurisdiction of this Court when it commenced the action;
(4) Future savings to litigants of legal fees which would have certainly been generated if this settlement was not executed;
(5) Peace of mind and certainty of Authority-bondability which flows from the lifting of the burden of litigation.
The primary policy of R. 4:42-9 is that each litigant shall bear his own costs. Grober v. Kahn, 47 N.J. 135, 143 (1966). However, where a litigant advances the interests of a class and creates a discernible benefit or fund for that class, it is equitable that he be rewarded by charging the beneficiaries of the fund for his legal expenses. Sunset Beach Amusement Corp. v. Belk, supra 33 N.J. at 168-169. The charges are usually against the fund and thereby each beneficiary contributes equally.
In the instant case numerous attorneys and litigants contend that they are entitled to an equitable award of counsel fees to be paid by the Authority. They claim that without their efforts the principles of Ceva would not have been applied to all members of the Authority. However, it was the Authority and not any of the members which commenced the suit. The Authority should not be criticized for starting this action; it considered Ceva to have far-reaching implications for its operation and reasonably sought to clarify the effect of the case upon its future. This clearly has not been a popular law suit. Nevertheless, it is one which should have been commenced and the court is pleased that the nagging *452 issues of Ceva are not put to rest in this county. Based upon the Authority's actions it is reasonable to argue that it, too, contributed to bringing this litigation to an end; it certainly can be said to have advanced interests other than its own and helped create some of the funds enumerated above. Perhaps the Authority should apply for counsel fees as well.
But, of course, this would be absurd. The Authority was primarily seeking to protect its own interests. These interests were (1) upholding the validity of the rate; (2) limiting the Authority's liability, if any, to the Pascack Valley towns for the illegal base charges paid, and (3) clarifying the relationship of the Authority to its member municipalities. In many instances, the Authority and the municipalities were in an adversarial stance. Other times, the parties were realigned and worked in harmony for a given result. This is also true of the classes of towns. Each class had its own interest to defend and advance. The various classes were not at all times allied. Indeed, the Southern towns bitterly opposed the award and size of the refund. The Northern Valley towns strenuously argued that they should not participate in the refunds. Other alliances and factions developed during the litigation. This case clearly was of an adversarial nature among and between classes of parties. By no stretch of the judicial imagination can this court convert what was essentially an intrafamilial squabble into an example of harmonious municipal cooperation. Each class had something to gain and something to lose. Each class protected and advanced its parochial interests. It was not until all sides realized that the bickering was counter-productive that settlement discussions began. Thus, it is fallacious to argue that the litigants here sought to advance the interests of a class larger than the individual municipalities. For this reason alone the court cannot invoke the fund in court rationale to support an award of fees from the Authority. The various classes did not do anything until the end of the litigation to benefit other classes. The case is no different from any other adversary *453 proceeding. The proposed funds were not generated by the force of the litigation but rather they were generated by the settlement. The mere contributing to a settlement is not a sufficient basis upon which to award counsel fees.

PUBLIC LITIGATION/PRIVATE ATTORNEY-GENERAL
While it may be true that in certain circumstances counsel fees may be awarded to attorneys who participate in public litigation, Mills v. Electric Autolite Co., 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970); contra, Alveska Pipeline Co. v. Wilderness Society, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed. 2d 141 (1975), this rule is based upon the principle that the judiciary possesses inherent equitable powers which may be invoked to award counsel fees to deserving litigants. This principle, which this court believes is viable in New Jersey, is nevertheless severely restricted in the area of counsel fees. Indeed, R. 4:42-9 and its predecessors were intended to prevent the abuses under the old chancery practice. This court is reluctant to invoke its equitable powers in this case under the guise of the public litigation or private attorney general rubric. This case is an inappropriate vehicle for the award of counsel fees under this principle. Those litigants and attorneys seeking fees did not initiate the action. They were in this case involuntarily and were required to participate. This is unlike the situation in Ceva where Kurland voluntarily took upon himself the burden of advancing arguments on behalf of a larger class.
There is no danger here of creating a vacuum of public interest attorneys by the failure to award counsel fees on the basis of the public litigation or private attorney general principle. Competent attorneys will not be dissuaded from participating in public litigation. Public bodies will continue to pay well and will continue to litigate issues which affect the public interest. Ceva is precedent for the proposition that public litigation may be rewarded in appropriate cases. Here, however, the adversarial nature of the case and the posture *454 of the defendants as protectors of parochial interests preclude the award of fees based on this theory.

QUASI-CONTRACT
When the Court limited the number of attorneys permitted to participate in this case to five, it did so mainly in the interest of judicial economy. It would have been absurd to conduct this action with 44 cooks to potentially spoil the broth. Since the claims neatly broke down in favor of discernible classes of municipalities, it was only logical that spokesmen be appointed to prosecute the interests of each class. Not only would the conduct of the pretrial and trial proceedings be enhanced but the dollar savings to the public by limiting attorneys' fees would be enormous. This anticipated result may now seem to have been naive considering that the total claims before the court now amount to over $120,000. However, if each town had participated with its own attorney, it is highly likely that even greater claims for fees would have been presented. We know, of course, that no one expects an attorney to give his services at bargain rates in a civil matter on behalf of a public client who is not impecunious.
To repeat, the identifiable classes as recognized earlier in this case by Judge O'Brien are the following:
1. Southern towns represented by Messrs. Durkin and Covitz.
2. Northern Valley towns represented by Mr. De Vito.
3. Pascack Valley towns represented by Mr. Bernstein.
4. Miscellaneous towns represented by Mr. Schneider.
Each of these attorneys expended enormous time, energy and money in the presentation of the various positions. There is no doubt that each attorney represented the interests of his designated class. Each class member benefitted from the work expended by the attorney on its behalf. At no time prior to the summer of 1975 was there ever any opposition expressed by any town to the representation given it by one of the designated spokesmen. It is only Hasbrouck Heights which now argues that it never consented to Durkin's and Covitz' representation. *455 However, Hasbrouck Heights had impliedly waived any objections by allowing those two attorneys to so effectively argue the interests of the Southern towns and of Hasbrouck Heights (which Judge O'Brien had found as identical to the Southern towns). However, on July 30, 1975 and thereafter Hasbrouck Heights went its separate way from the Southern towns and it was no longer represented by the Durkin-Covitz team. Based upon the foregoing the court is irresistibly compelled to find that unless these spokesmen-attorneys are compensated for their time and efforts, the individual members of each class will have been unjustly enriched. The facts of this case bespeak a situation where the equitable thing to do is to award the spokesmen-attorneys counsel fees based upon the theory of quasi-contract. In the case of Callano v. Oakwood Park Homes Corp., 91 N.J. Super. 105 (App. Div. 1966), Judge Collester stated:
Contracts implied by law, more properly described as quasi or constructive contracts, are a class of obligations which are imposed or created by law without regard to the assent of the party bound, on the ground that they are dictated by reason and justice. They rest solely on a legal fiction and are not contract obligations at all in the true sense, for there is no agreement; but they are clothed with the semblance of a contract for the purpose of the remedy, and the obligation arises not from consent, as in the case of true contracts, but from the law or natural equity. Courts employ the fiction of quasi or constructive contract with caution. 17 C.J.S. Contracts § 6, pp. 566-570 (1963).
In cases based on quasi-contract liability, the intention of the parties is entirely disregarded, while in cases of express contracts and contracts implied in fact the intention is of the essence of the transaction. In the case of actual contracts the agreement defines the duty while in the case of quasi-contracts the duty defines the contract. Where a case shows that it is the duty of the defendant to pay, the law imparts to him a promise to fulfill that obligation. The duty which thus forms the foundation of a quasi-contractual obligation is frequently based on the doctrine of unjust enrichment. It rests on the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another, and on the principle of whatsoever it is certain a man ought to do, that the law supposes him to have promised to do. St. Paul Fire, etc., Co. v. Indemnity Ins. Co. of No. America, 32 N.J. 17, 22 (1960).
The key words are enrich and unjustly. To recover on the theory of quasi-contract the plaintiffs must prove that defendant was enriched, *456 viz., received a benefit, and that retention of the benefit without payment therefor would be unjust. [at 108-109]
Quasi-contractual obligations are imposed by the law for the purpose of bringing about justice without reference to the intentions of the parties. Indeed, they are sometimes imposed even against the clear expression of intent. See St. Paul Fire, etc. Co. v. Indemnity Ins. Co. of No. America, supra, 32 N.J. at 22.
Here the spokesman-attorney toiled on behalf of municipalities who were only too glad to have an expert represent them. Enormous amounts of energy were expended by the attorneys on this case, and it is only fair and just that these attorneys be reasonably compensated. Thus, on the basis of the theory of quasi-contract, this court will award counsel fees to those attorneys who can prove that they worked on behalf of a class of towns. At the very least the following attorneys shall be entitled to collect fees:
Martin Durkin and Morton Covitz from the Southern towns, excluding Teaneck, Westwood and Cresskill.
Jacob Schneider from the Miscellaneous towns.
Frank De Vito from the Northern Valley towns.
Fred Bernstein from the Pascack Valley towns.
These fees shall be collectible from the municipalities and shall be equally apportioned within each class. When the amounts are fixed by the court, it will enter an order specifying and designating the amounts owed by each municipality.
The court will entertain an application on behalf of Winne & Banta, Esqs., to determine if any part of its fees may be attributable to and paid by the Northern Valley towns. Counsel are directed to submit or resubmit affidavits of services on notice to the towns within their respective class. Hasbrouck Heights will not be responsible for any fees generated by either Covitz or Durkin on or after July 30, 1975. Fees generated prior to April 19, 1974 are not chargeable to the respective classes because the spokesmen were not recognized until that date by Judge O'Brien. A hearing on the amount of fees shall be held on June 25, 1976 at 10:30 A.M. before this court.